Destribats, Campbell, Staub & Schroth
By; David P. Schroth (029171993)
527 Whitehorse Ave
Hamilton, NJ 08610
(609) 882-0041
Attorneys for Plaintiff Jodi Asay

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

| | | |
|---|---|---|
| JODI ASAY | : | |
| | : | CIVIL ACTION |
| Plaintiff | : | |
| | : | DOCKET NO. |
| v. | : | |
| | : | COMPLAINT AND DEMAND |
| NJ TRANSIT RAIL OPERATIONS, INC., | : | FOR JURY TRIAL |
| NEW JERSEY TRANSIT RAIL CORP., | : | |
| BROTHERHOOD OF | : | |
| LOCOMOTIVE ENGINEERS AND | : | **Filed Electronically** |
| TRAINMEN, JAMES P. BROWN, | : | |
| Individually and in his capacity as an | : | |
| Employee of NJ Transit Rail Operations, Inc. | : | |
| or NJT Rail Corp.DAVID C. DECKER, | : | |
| individually and in his | : | |
| Capacity as an employee of NJ Transit Rail | : | |
| Operations, Inc., or NJT Rail Corp. FRED | : | |
| MATTISON, | : | |
| individually and in his | : | |
| Capacity as an employee of NJ Transit Rail | : | |
| Operations, Inc.  or NJT Rail Corp. | : | |
| ALAN ANTELL, individually and in his | : | |
| Capacity as an employee of NJ Transit Rail | : | |
| Operations, Inc., or NJT Rail Corp. | : | |
| DONALD BROCHARDT | : | |
| individually and in his | : | |
| Capacity as an employee of NJ Transit Rail | : | |
| Operations, Inc. or NJT Rail Corp. | : | |
| John Does 1-25 ( said name being fictitious) | : | |

The plaintiff, Jodi Asay, residing at 514 Maple Ave, Ewing, NJ 08618, by way of Complaint against Defendants alleges and says:

## COMPLAINT

## NATURE OF ACTION

Plaintiff brings this action against the defendant, New Jersey Transit Rail Operations, Inc. and/or New Jersey Transit Rail Corp. for violations of the Federal Rail Safety Act, 49 U.S.C. sec. 20109 (FRSA), and specifically targeting her and ultimately terminating her wrongfully for being a Whistleblower engaged in protected activities when she made known certain dangerous activities NJ Transit was engaged in. specifically they were using "short turns" and inadequately inspecting passenger trains before before rides. She brings this action against the Brotherhood of Locomotive Engineers for breach of its duty of fair representation to her and against James P. Brown, individually, and in his capacity as an employee of New Jersey Transit Rail Operations, Inc. or New Jersey Transit Rail Corp., and General Chairman of the BLE and David C. Decker individually, and in his capacity as an employee of New Jersey Transit Transit Rail Operations, Inc. or New Jersey Transit Rail Corp., and General Chairman of the BLE. Fred Mattison, individually, and in his capacity as an employee of New Jersey Transit Rail Operations, Inc. or New Jersey Transit Rail Corp., ALAN ANTELL, individually and in his capacity as an employee of Transit Rail Operations, Inc. or New Jersey Transit Rail Corp., DONALD BROCHARDT individually and in his capacity as an employee of NJ Transit Rail Operations, Inc. or NJT Rail Corp.  and John Does 1-25 ( said name being fictitious)   each for participating in her unfair representation and retaliation for her Whistleblowing and protected activities.

## JURISDICTION AND VENUE

1. This court has subject matter jurisdiction in this case which arises under the Federal Railroad Safety Act, 49 U.S.C. sec. 20109(d)(3) (hereinafter FRSA).

2. This court has jurisdiction as to the Brotherhood of Locomotive Engineers and Trainmen and plaintiff is based on Diversity of Citizenship and an amount in controversy in exceeds the sum set forth in 28 U.S.C. sec. 1332. Brotherhood of Locomotive Engineers and Trainmen was formed in the State of Michigan and is a citizen of and has its headquarters and primary place of business in Independence, Ohio. Plaintiff Jodi Asay is a citizen of and resides in the State of New Jersey.

3. The Plaintiff invokes the court's ancillary and pendent jurisdiction as to plaintiff's action against individuals James P. Brown and David C. Decker, Fred Mattison, Alan Antell Donald Brochardt and John Does 1-25 who are residents of New Jersey.

4. Venue is proper in this Court pursuant to 28 U.S.C. Section 1391(b)(2) and (c).

## THE PARTIES

5. Jodi Asay has at all times relevant hereto employed by New Jersey Transit (NJT) also known as New Jersey Transit Rail Operations, Inc., (NJT) and held the position of Engineer. At all times relevant hereto Jodi Asay, as an employee of NJT, was a dues paying member of the Brotherhood of Locomotive Engineers & Trainmen. (BLE) During a certain period of her employment she was known by her then married name of Jodi Blum.

6. New Jersey Transit Rail Operations, Inc. (NJT) and or New Jersey Transit Rail Corp. (NJT) is a corporation duly organized and existing under and by virtue of the laws of the

State of New Jersey and conducts substantial business in New Jersey with its principal place of business located at One Penn Plaza East, Newark, New Jersey 07105and at all times relevant hereto operated trains in and had employees working in and did business in New Jersey. On information and belief, it is a subsidiary of New Jersey Transit. Each NJT defendant is referred to as NJT and construed as her employer.

7. The Brotherhood of Locomotive Engineers & Trainmen (BLE) is the Collective Bargaining Unit and/or Union duly organized and formed under the auspices of the National Labor Relations Board, on information and belief in the State of and under the laws of Michigan and and has as its primary place of business and its headquarters at 7061 East Pleasant Valley Road, Independence, Ohio 44131and represents its membership.

8. James P. Brown is General Chairman of BLE and was in charge of the BLE in New Jersey and resides at 16 Cypress Point Rd. Westampton, NJ 08060.

9. David Decker was at all time relevant hereto the General Chairman of BLE and is currently a former Chairman having been succeeded by Mr. Brown and resides at 44 Paderewski Rd., Oak Ridge, N.J. 07438

10. Fred Mattison, residing at 449 Democrat Road, Gibbstown, NJ was at all times relevant hereto employed by NJT and acted as a charging officer at Plaintiff's NJT disciplinary hearings.

11. Alan Antell, residing at 292 Green Grove Road, Ocean, NJ 07712, was at all times relevant hereto employed by defendant NJT and adjudicated Plaintiff's NJT disciplinary hearings as set forth herein.

12.     Donald Brochardt residing at 9 Brittany Court, Howell, NJ 07731was at all times relevant hereto employed by NJT and adjudicated plaintiff's NJT disciplinary hearings as set forth hereing.

## FACTS

13.     During all times relevant herein, the defendant railroad carrier engaged in interstate commerce by providing railroad transportation between several of the states of the United States, including but not limited to the State of New Jersey, the Commonwealth of Pennsylvania and the State of New York.

14.     During all times relevant hereto, defendant BLE had its headquarters in Cleveland, Ohio  and did conduct business in the aforesaid States and, in particular, New Jersey, and was charged with representing its members and protecting said members interests, including plaintiff,  as they worked in those aforesaid States and in the case of plaintiff, on behalf of her employer New Jersey Transit.

15.     Portions of the rails, or train tracks upon which NJT operates it trains are owned and controlled by Amtrak.

16.     NJT engineers operate, or, in layman's terms, drive the trains. All engineers are tested on the rules and regulations under which they operate all trains and must pass said tests with a score of 80% or better.

17.     If an engineer violates certain rules when operating a train on Amtrak territory that are considered a serious act, that engineer can have their certification to operate a train suspended or revoked. It is called "decertification".

18. If a decertifiable, negligent or serious act occurs on Amtrak property, Amtrak will pursue charges and issue an immediate barring letter prohibiting the engineer from operating trains on their tracks until an investigation has been completed and the engineer has been deemed able to operate on their tracks.

19. NJT is responsible for the maintenance, functioning and safety of its trains.

20. NJT is charged with the obligation to provide safe transportation for the public along the rails of New Jersey.

21. NJT is responsible for providing its employees with a safe work environment including on its trains.

22. NJT is governed by certain policies, practices and/or requirements including but not limited to the United States Code, Northeast Operating Rules Advisory Committee (NORAC) rules and code of federal regulations to maintain the trains that transport these millions of passengers daily and yearly.

23. These passengers use the New Jersey Transit trains for transportation for innumerable purposes including but not limited to, for example, commuting to work, to travel into New York City or North Jersey for shopping, sporting events, sightseeing, school and visiting friends and family and transportation in general.

24. There is a clear public policy and interest in providing safe transportation to the public on NJT trains and a safe environment for its employees.

25. Passengers are charged a monetary fee or fare for each ride on the train. For example, they are charged a monetary fee for a ride into New York City from any New Jersey Transit Train Station in New Jersey. If they return from New York (or any destination) they are charged a separate monetary fee or fare.

26. Over the course of any given year, with thousands upon thousands of trips along the railways of New Jersey, whether it be the Northeast Corridor, or Coastline route or others, the more trips the trains make to and from destinations the more money New Jersey Transit Rail, a common carrier, makes.

27. Federal law and/or federal regulations mandate inspections of NJT trains before each trip begins. NJT has its own Rules requiring inspections of each train between each ride when changing control stands or train consists (equipment).

28. These inspections take many minutes to perform and can take up to 45 minutes to properly complete.

29. In an effort to reduce time between train trips and therefore increase the number of train trips over the course of each day, week, month and year, New Jersey Transit cuts corners on the safety inspections, abbreviating them or eliminating them altogether on various trips each day. This practice has a name: it is called a "short turn".

30. A short turn is a violation of the laws and/or regulations governing NJT train inspections and safety. It is also a violation of public policy for NJT to fail to properly inspect its trains to provide for the safety of its passengers as well as its employees.

31. The failure to conduct proper safety inspections and to instead choose to engage in "short turns" places the public who ride New Jersey Transit Trains and New Jersey Transit's employees who work on the trains in danger. Safety is compromised in the name of time and money.

32. The failure to conduct proper safety inspections violates the clear public policy of providing safe trains for the public to ride and a safe workplace for its employees.

33. Plaintiff Jodi Asay reasonably believed and believes and knows NJT has violated and is violating laws, regulations and/or public policy by engaging in the practice of "short turns" and failing to give the train crew sufficient time to conduct proper safety inspections of trains between trips. This is due to NJT's scheduling of trains.

34. As set forth herein, Plaintiff engaged in a "protected activity" by disclosing to her superiors, Union Officials, an elected official and others that this practice was taking place. She did so to point out the danger to the public and employees and to stop the practice.

35. Beginning in or about June, 2014, Plaintiff Jodi Asay did complain to her Union by filing a grievance about the practice of "short turns" and the danger that they posed.

36. Subsequently, Asay did contact the Regional Zone 1 Manager of the Federal Railroad Administration (FRA), Peter LePre on or about June 9, 2014 and Richard Green and Paul Hraska, also of the FRA.

37. Asay reported the dangerous practice to the New Jersey Department of Transportation who advised they had no jurisdiction.

38. Asay contacted Governor Chris Christie's Office as well as the National Brotherhood of Locomotive Engineers and Trainmen in Cleveland, Ohio.

39. In or about October 17, 2016, Ms. Asay did specifically advise Liberty Mutual Insurance, who was providing certain risk management services to New Jersey Transit, that Transit was engaging in this practice of short turns and that it posed a danger to the passengers that ride the trains as well as NJ Transit employees.

40. In sum, she advised and complained to her superiors, upper management, including but not limited to Patrick Martin, government officials, Union officials and others on

multiple occasions regarding this hazard and its violation of the law and/or rules and/or regulations governing the operation of trains.

41. Beginning on or about November 3, 2016, just two weeks after her complaint to Liberty Mutual Insurance, New Jersey Transit did begin to engage in a pattern of retaliation and retribution for her whistleblowing. Among other things, false and bogus charges were brought against her as a pretext for her subsequent termination. The retaliation continued thereafter and culminated in her termination from New Jersey Transit on December 12, 2017.

42. Specifically, false charges were brought against her on November 3, 2016 and September 22, 2017.

43. Her November 3, 2016 and September 22, 2017 and charges were presented by Fred Mattison, a substitute charging officer at a hearing at NJT headquarters in Newark, NJ.

44. Defendant NJT by and through Mattison intentionally presented false and misleading evidence and false testimony against plaintiff.

45. The hearing was unfair for multiple additional reasons including but not limited to not allowing her to present witnesses in violation of NJT rules regarding the conducting of such hearings.

46. The November 3 charges, in summary, alleged that while operating a train she violated certain speed restrictions or speed limits. In fact, she made a proper inquiry about the speed restrictions and was authorized by the Amtrak dispatcher to proceed at the speed she used.

47. By obtaining permission from Amtrak's dispatcher, any error on plaintiff's part was negated making her operation permissible under those circumstances under federal law, 49 C.F.R. 240.307(i)(1) and (2).

48. Her November 3 charges were adjudicated by defendant Donald Brochardt, a NJT employee, who upheld the charges brought against Asay thereby sanctioning an unfair hearing and ignoring applicable rules.

49. Brochardt, the adjudicator, did uphold the charges against Asay despite clear evidence supporting her position and exonerating her.

50. Brochardt decertified plaintiff as part of the decision, meaning he suspended her from operating trains.

51. David Decker was at all time relevant hereto the General Chairman of BLE and is currently a former Chairman having been succeeded by Mr. Brown. He denied plaintiff's original grievance in reference to safety concern of short turns.

52. Defendant David Decker, as the General Chairman, had a duty to represent and advocate on Asay's behalf and did not do so.

53. Decker did refuse to represent plaintiff in the November 3, 2016 incident and did not represent plaintiff when sent letter for all reasons she should be exonerated. He then replied to her private email mocking her and copied all the members of the General Committee of Adjustment who are members of the Union in an effort to humiliate her.

54. David Decker did actively interfere with her application for C3RS protections regarding the November 3 incident. On information and belief was asked to resign. Decker has advocated aggressively for employees charged with a variety of multiple willful violations offenses including employees who committed, for example, multiple speed violations, drug and alcohol violations and even crashed and derailed trains.

55. A second set of false charges were brought against plaintiff for an incident of September 22, 2017

56. Plaintiff was alleged to have violated a "stop signal" allegedly moving her train improperly through a stop light in Penn Station, New York. In fact, plaintiff Asay received an instruction to proceed from the Conductor who controls the movement of the train.

57. In this incident there was clear evidence exonerating her. Instead, altered and doctored evidence was used against her.

58. The Conductor on plaintiff's train was responsible for the error and admitted his fault. He was not brought up on charges and disciplined despite violating 4 different rules that caused the stop signal violation.

59. Despite the Conductor's admission of guilt, Alan Antell, who adjudicated this case, did knowingly and/or willfully allow and base his decision on doctored and altered evidence. He further adjudicated the matter against her despite clear evidence she was not allowed to call witnesses in her defense. This violated her rights to a fair hearing.

60. Antell decertified her. Decertification, as noted above herein, is a revocation of the Engineer's license to operate trains.

61. Each of the aforementioned charges and decertifications were necessary predicates to terminate Plaintiff on December 12, 2017.

62. In order to terminate Asay, she had to be decertified twice within 2 years.

63. Antell and NJT did wrongfully terminate Plaintiff Asay on December 12, 2017.

64. Defendant's James P. Brown and David C. Decker did participate in the process or willfully and intentionally ignore the wrongful prosecuting and adjudicating of the aforementioned charges, plaintiff's decertifications and termination in retaliation for Asay's reporting of the "short turns".

65. NJT and the BLE were aware of the fact altered and bogus evidence was used against her in the proceeding. Both NJT and the BLE were aware she was denied witnesses and allowed the matter to proceed and create a false basis and predicate for her termination.

66. James P. Brown is General Chairman of BLE and was in charge of the BLE in at the time Asay filed for arbitration to appeal the two incidents at issue herein having replaced David Decker.

67. Asay filed for arbitration appealing the November 3 and September 22 incidents. It was scheduled for arbitration with a Mr. Twomey.

68. Asay feeling Twomey was biased asked for a new arbitrator. Brown refused to honor her request.

69. When Asay brought up 2 transcript (altered transcript) issue Brown held meeting with the arbitrator without her and played an unknown tape supposedly of Asay for Twomey. To this day Asay has no idea what Twomey heard.

70. Brown and the BLE defended company position and not hers. Brown and NJT further Violated Collective Bargaining Agreement by having hearing on NJT grounds. Should have been somewhere else and with arbitrator parties agreed to.

71. Brown also allowed the aforementioned NJT disciplinary hearings allowed hearing without charging officer.

72. Plaintiff was terminated on or about December 12, 2017.

73. Arbitrator Twomey upheld plaintiff's termination on February 8, 2019.

74. Defendants Brown, Decker, Mattison, Antell and Brochardt did jointly, severally and/or individually act willfully, intentionally, recklessly and maliciously toward plaintiff and breached their fiduciary obligations to her in an effort to have her wrongfully fired, embarrass

her, emotionally distress her and to avoid responsibility for the hazard NJT allows to exist with the short turns and to retaliate for her whistleblowing regarding said short turns.

## COUNT ONE

## FRSA CUASE OF ACTION

75. Plaintiff repeats realleges and incorporates herein the allegations set forth in paragraphs 1 through 72 as if set forth at length herein.

76. Plaintiff was employed as an Engineer who operated NJT trains, primarily trains carrying passengers on the Northeast Corridor route as well as other routes beginning November 10, 1999.

77. During Plaintiff's employment with NJT relevant hereto she was under the supervision of certain NJT supervisors, including but not limited to Pat Martin and Lee Williams.

78. Said supervisors regularly ordered Plaintiff and other employees to violate FRA regulations, NORAC Rules, NJT operating and safety rules, and other rules, so that employees would perform their work more quickly and/or produce more work.

79. Said illegal orders included, but are not limited to, operating trains without having had proper safety inspections and/or engaging the practice of "short turns".

80. On numerous occasions plaintiff was told to shut up (about the short turns and other activities) and just drive the trains as instructed

81. Plaintiff engaged in numerous protected activities.

82. The defendant NJT had knowledge of the protected activities referenced above.

83. NJT took adverse or unfavorable actions, and engaged in a pattern of retaliatory behavior, including her termination (while out on sick leave pending total disability which was granted), against the plaintiff in whole or in part due to her protected activities when it engaged in the retaliation and discipline.

84. In so doing the defendant NJT acted with reckless disregard for the law and with complete indifference to the plaintiff's rights under the FRSA.

85. The plaintiff reported her complaint to the appropriate Regional OSHA Whistleblower Office. This was filed within 180 days from the date the plaintiff became aware of the defendant's taking adverse or unfavorable personnel action against her.

86. The OSHA Whistleblower Office commenced its investigation and the plaintiff fully cooperated with OSHA's investigation. However, OSHA did not issue a final decision within 210 days after the filing of the FRSA complaint. The delay was not due to any bad faith on the part of the plaintiff.

87. On December 4, 2018 Plaintiff filed a Notice of Intent to File Original Action in United States District Court with the OSHA Regional Whistleblowers Office.

88. More than 15 days have elapsed since plaintiff filed her Notice of Intent.

89. Plaintiff has exhausted all administrative remedies as required by statute and/or common law.

90. Pursuant to the 49 U.S.C. sec. 20109(d)(3) of the FRSA, the plaintiff has a statutory right to bring an original action in the United States District Court for a jury trial regarding the railroad's violation of the FRSA.

91. Pursuant to the FRSA, 49 U.S.C. sec 20109(d)(3), the plaintiff is now bringing this original action in law and equity for de novo review by the United States District Court for the District of New Jersey, which has jurisdiction over this FRSA action without regard to the amount in controversy.

92. As a direct and proximate result of the defendant's conduct defendant has suffered great monetary damages in lost income, future lost income, pension and benefits and has become physically ill, injured and suffered great emotional distress, Post Traumatic Stress Disorder (PTSD), anxiety, depression, embarrassment, and humiliation and is now on Total Disability.

**WHEREFORE**, in order to encourage employees to freely report all injuries without fear of any retaliation, and further to encourage all employees to freely report unsafe conditions and violations of federal statutes and regulations, thereby ensuring the Federal Railroad Administration promotes safety in every area in our nation's railroad operations, and for her economic and physical injuries and losses sustained, the plaintiff demands judgment against NJT, James Brown, David Decker, Fred Mattison, Alan Antell, Donald Broschardt under FRSA for all relief necessary to make her whole including but not limited to:

   a. Expungement of all references to the disciplinary actions set forth above;
   b. Compensatory damages for mental anguish, emotional distress due to the defendant's conduct;
   c. Compensatory damages for economic losses due to the defendant's conduct
   d. The statutory maximum of punitive damages;
   e. Special damages for all litigation costs including expert's fees and attorney fees.

## COUNT TWO

### (Duty of Fair Representation)

93. Plaintiff repeats realleges and incorporates herein the allegations set forth in paragraphs 1 through 73 as if set forth at length herein.

94. The BLE is charged with fairly representing Plaintiff Asay in employment related issues including but not limited to fairly representing her in work related disciplinary hearings.

95. At her disciplinary hearings set forth above herein, the BLE did fail repeatedly to fairly represent plaintiff Asay. Their representation and advocacy was superficial at best, with a feigned interest in defending her Collective Bargaining rights and was, in sum, arbitrary, capricious and discriminatory. It was fraudulent, deceitful, dishonest and intentional.

96. Their failure to fairly represent plaintiff included failing to challenge the repeated deprivation of her rights by NJT at disciplinary hearings and other proceedings.

97. These failures included but are not limited to the failure to challenge the refusal of NJT to allow her to call witnesses, have the charging officer present at each hearing, the denial of access to exculpatory evidence, advocate on her behalf regarding doctored evidence and altered transcripts from hearings and lack of verbatim testimony in these transcripts.

98. They failed to represent her properly in termination hearings and failed, for example, to object to hearings being heard by a biased arbitrator favored by NJT in or about December of 2018 when plaintiff objected, within her rights, to her arbitration being heard by a Mr. Twomey. Plaintiff was within her rights to do so and have had a different arbitrator. Her Union used Twomey despite her objections and Twomey promptly ruled in NJT's favor in spite of the many improprieties perpetrated by NJT including the use of altered documents and altered and tampered with transcripts.

99. Upon her termination did fail to represent her and advocate for her before OSHA.

100. They failed to represent her and advocate for her before the LERB and FRA.

101. In each of these instances the BLE completely abandoned plaintiff Asay leaving her to file complaints and actions before OSHA and the FRA.

102. Plaintiff initially pursued these avenues *pro se* before ultimately hiring counsel at great expense and to her financial detriment.

103. In each instance, Asay presented to her Union, the BLE, clear evidence that she was innocent and had been wrongly charged, punished and wrongfully terminated.

**WHEREFORE** Plaintiff Jodi demands judgment in her favor awarding damages as follows:

   a. compensatory damages

   b. punitive damages

   c. such other damages this Court deems equitable and just

## DEMAND FOR JURY TRIAL

The Plaintiff hereby demands trial by jury as to all issues in the above matter.

## DESIGNATION OF TRIAL COUNSEL

Pursuant to Rules governing Civil practice in the Federal Courts, David P. Schroth, Esquire is hereby designated as trial counsel in this matter.

## **CERTIFICATION**

I hereby certify that the matter in controversy is not the subject of any other court, arbitration or administrative proceeding.

                                              DESTRIBATS, CAMPBELL, STAUB & SCHROTH
Attorneys for Plaintiff, Jodi Asay

/s/ David P. Schroth
DAVID P. SCHROTH, ESQUIRE

Dated: August 8, 2019